DECISION AND JUDGMENT ENTRY
{¶ 1} Following a bench trial, Walter Young appeals his convictions for aggravated burglary, aggravated robbery, and felonious assault and contends they are based on insufficient evidence and against the manifest weight of the evidence. He argues that only one eyewitness placed him inside the victim's home around the time of the incident and that the State presented insufficient circumstantial evidence to prove all of the essential elements of the offenses. He also argues that the trial court, as the trier of fact, "lost its way" because it was biased and prejudiced by knowledge it obtained through pretrial proceedings.
 {¶ 2} The State presented evidence to show that a witness, who had known Young for a "long time," observed him through a glass door trying to escape the victim's locked home while the victim lay unresponsive on the floor. The EMT personnel who *Page 2 
responded to the scene found long "ties" from the victim's blouse knotted tightly around her neck restricting her breathing, and police later discovered that her house appeared in disarray and that some items may have been missing. While defense counsel argued that the witness' identification was unreliable, the trial court was in the best position to judge her credibility. Moreover, because the trial court could properly believe the eyewitness testimony and all of the substantial circumstantial evidence presented at trial, we conclude the State presented more than sufficient evidence from which the trial court could have reasonably concluded, beyond a reasonable doubt, that Young committed these offenses.
 {¶ 3} Furthermore, Young offers no evidence of judicial bias or prejudice other than the mere fact that the trial court previously presided over pretrial proceedings. A trial judge is not disqualified and need not recuse himself merely because the judge acquired knowledge of the facts during pretrial proceedings. Thus, Young fails to overcome the presumption that the judge considered only relevant, material, and competent evidence during the bench trial.
 {¶ 4} Next, Young contends that his trial counsel was ineffective because after he waived his right to a jury trial, counsel failed to request that the judge recuse himself due to the substantial knowledge of the facts he acquired during pretrial proceedings. However, our review of the record shows that trial counsel strategically decided to waive a jury because they believed that the judge would be more likely to find in Young's favor on the issue of causation of the victim's death. Young offers no evidence of judicial bias or prejudice and the judge in fact found Young not guilty of the aggravated murder *Page 3 
charges. As trial counsels' decision to try the case to the judge was sound trial strategy, Young cannot show deficient performance.
 {¶ 5} Finally, Young contends that trial counsel was deficient for failing to file a motion to suppress his statement to detectives. Young argues that after he invoked his Miranda rights and requested an attorney, the detectives conducted the functional equivalent of a "custodial interrogation" and thus his statement should not have been used against him at trial. Because the detective's "offhand remark" to the other detective while transporting Young back to Portsmouth was not reasonably likely to elicit an incriminating response from Young, he was not "interrogated" within the meaning of Miranda. Thus, Young cannot show that a motion to suppress would have had a reasonable probability of success, and counsel's performance was not deficient.
 I. Facts {¶ 6} A Scioto County grand jury indicted Young on one count of aggravated burglary, one count of aggravated robbery with a repeat violent offender specification, and three different counts of aggravated murder, which contained five aggravating factors/specifications. Both parties filed numerous pretrial motions, and the court conducted hearings on various issues, including an Evid. R. 702 hearing on the admissibility of expert testimony and a hearing on Young's motion to suppress eyewitness testimony. The State later dismissed the death specifications. After Young waived his right to a jury trial, the matter proceeded to a bench trial, which produced the following evidence.
 {¶ 7} On the morning of October 14, 2005, Carla Messer, an employee of the United Scioto Senior Activities Organization (Senior Center), arrived at the home of 95- *Page 4 
year-old Louella Ridley to drive her to a doctor's appointment. Messer testified that Ms. Ridley was wearing a cream colored blouse that was designed to tie in a bow around the neckline and that she assisted Ms. Ridley in tying a loose, double loop bow. After Ms. Ridley's doctor's appointment, Tina Gills, another employee of Senior Center, drove her home. Gills testified that as she was leaving the house, she asked Ms. Ridley, who was sitting on her couch, whether she wanted her to lock the door. Ms. Ridley told her to close it but not lock it because she was expecting her Meals on Wheels. When she got into her car to leave, Gills documented her time and mileage; she left Ms. Ridley's home at 12:10 p.m.
 {¶ 8} Carla Womack, Ms. Ridley's "common law" granddaughter, testified that she saw Ms. Ridley "quite often" — at least three times a week and sometimes everyday. As a way to stay in touch, they would "trade $20.00" back and forth. The day prior to the incident, Womack gave Ms. Ridley $20.00, and they made lunch plans for the next day. Womack testified that when she arrived at Ms. Ridley's home at approximately 12:30 p.m. with her lunch, she found the front door locked. Womack testified that both the storm (security) door and the inside (hard) door were closed and that she tried the security door but it was locked. After she knocked and rang the doorbell, she looked through the curtains and saw somebody moving inside between the dining room and kitchen. She looked down and saw Ms. Ridley's false teeth on the floor. She then looked over and saw Ms. Ridley lying on the floor. She started screaming and again looked back through the house at the kitchen, towards the back door. She testified that she saw a man walking towards the back door. At first she did not recognize him, and she started screaming Ms. Ridley's name. The man walked to the back door, but could *Page 5 
not get out. She testified that he then turned towards her and that at that point she recognized Walter Young and shouted "Walter, oh my God it's Walter, Walter, Walter what are you doing?" As she was shouting his name and shaking the door, he turned and started walking towards the front door. She then ran.
 {¶ 9} Womack testified that she has known Young for a "long time" through a family marriage and because they attend the same church. She also testified that Young stays with his mother, Andria Young, who lives behind Ms. Ridley's residence. Archie Jackson, Ms. Ridley's great nephew, testified that Mrs. Young had been Ms. Ridley's friend and caretaker for a period of time. When asked if she had "any doubt" the man she saw was Young, Womack stated "no."
 {¶ 10} Womack testified that she initially ran to the next door neighbor's house for help, but no one answered the door. She then ran to Russell Malone's home and told Malone "Walter's in Ms. Ridley's house." She and Malone ran back to Ms. Ridley's home, while Mrs. Malone called the police. When Womack and Malone arrived at her home, the security door was standing open. Malone testified that Ms. Ridley was lying on the floor and making "goggling" noises with her throat. He testified that he "cleared" the house to make sure no one else was inside the residence. He also testified that the back door was locked from the inside and that you need a key to unlock it. Finally, he testified that he had seen Young in the area the previous night.
 {¶ 11} Officers Jonathon Peters and Ron Davis with the Portsmouth Police Department arrived at the scene within minutes. Officer Davis testified that he went to the back door, which was locked, while Officer Peters went to the front of the house. Officer Peters testified that upon entering the residence he observed Ms. Ridley lying on *Page 6 
the floor; Malone and Womack were there, and Womack told Officer Peters that "Walter Young had done this." Officer Peters also testified that he later spoke with detectives at the scene and volunteered to get Young's picture on file at the Department of Motor Vehicles (DMV) to help assist in a positive identification; later that afternoon, he took Young's photo to the hospital, where Womack positively identified him as the man she saw in Ms. Ridley's home.
 {¶ 12} Emergency Medical Technicians (EMTs) Susan Arnett and John Summers also responded to the call. Both generally testified about Ms. Ridley's condition upon their arrival and the measures they took to stabilize her. Ms. Ridley was unresponsive, and her breathing was "shallow" and "agonal," i.e., her airway was being shut off. The two long "ties" attached to the collar of her blouse were knotted around her neck. Summers testified that it took him "quite a lot of effort and force" to get the ties off. Both testified that when Summers removed the ties, Ms. Ridley "gasped" and started to breathe more easily. Arnett testified that she noticed red marks on both sides of Ms. Ridley's neck. Summers testified that she had a red, hematoma around the neck that started to swell, though his report indicated "no visible signs of injury." Summers testified that if they would have arrived much later, Ms. Ridley would have been in cardiac arrest. They attached a cervical collar, placed her on a back board, and moved her to the truck, where they gave her oxygen and checked her pulse and heart rate. Though her vital signs began to stabilize, she remained unresponsive, and they transported her to the emergency room at Southern Ohio Medical Center (SOMC).
 {¶ 13} Detective James Charles testified that he arrived at Ms. Ridley's residence at approximately 12:40 p.m. and that he was responsible for "processing" the scene. *Page 7 
He testified that he requested Womack to go through the house with him to look for anything that may have been disturbed. Womack testified that Ms. Ridley's purse, which was found in a chair in the living room, was empty except for three pennies, and that Ms. Ridley's wallet, which was found on a table in the dining room underneath a washcloth, was empty except for Ms. Ridley's Buckeye card and a Visa card; it contained no cash or coins. In Ms. Ridley's bedroom, Detective Charles and Womack found an opened checkbook "shipping" box, some checkbooks, actual checks, and checkbook registries on top of her dresser. Womack testified that Ms. Ridley normally kept her checks in her top dresser drawer, which was partially opened. Detective Charles testified that several other drawers were either open or partially open. Womack also testified that Ms. Ridley kept a glass ashtray on her dresser with a little money in it and sometimes some jewelry, but that she usually kept her jewelry in her dresser drawer. Detective Charles testified that the ashtray looked like it had been dumped out and the jewelry sorted through. Womack testified that Ms. Ridley had a "money jar," an old clear vase that she kept money and change in, that was missing. Womack also testified that Ms. Ridley kept a gun in the trash can next to her bed and that the gun was missing; the trash can also appeared to have been moved. She stated that the last time she actually saw the gun was a couple of years ago but that they had talked about the gun and joked about the "man" she slept with.
 {¶ 14} Detective Charles testified that after Womack pointed out things that she believed may have been disturbed, he took photographs of the items and then dusted for fingerprints. He also took measurements of the residence. Detective Charles testified that he was unable to lift any pints from the inside of the house but that he did *Page 8 
lift one partial print from the exterior back storm door. The print was later submitted to the Ohio Bureau of Criminal Identification and Investigation (BCI) for analysis.
 {¶ 15} Detective Chuck Crapyou testified that he was in the vicinity of the SOMC when he received the call and that he arrived at the hospital within minutes. He testified that after the emergency room provided Ms. Ridley with immediate medical attention, he began taking photographs of Ms. Ridley, who remained unresponsive; he testified that he noted an abrasion on her nose and red marks on her neck. Teresa Wright-Hiles, a nurse at SOMC, also testified that upon Ms. Ridley's arrival, she observed abrasions on her neck and nose. Detective Crapyou further testified that he spoke with Womack at the hospital about the incident and that she again identified Young as the intruder in Ms. Ridley's home; Detective Crapyou was also present when Womack positively identified Young from his DMV photo. Detective Crapyou collected Ms. Ridley's personal effects, including her blouse, which was later sent to BCI for testing. Finally, Detective Crapyou testified that on October 19, 2005, the Portsmouth Police Department received a call from Middletown Police Department informing them that they had Young in custody. Sgt. Ben Fugate and Detective Crapyou picked up Young and transported him back to Portsmouth the following day.
 {¶ 16} Michael Lindamood, a nurse at Heartland of Portsmouth, testified that Ms. Ridley was transferred from SOMC to the Heartland of Portsmouth on October 28, 2005, and he generally testified about her physical condition while she was living at the nursing home. Ms. Ridley died at the nursing home on November 26, 2005.
 {¶ 17} Randy Lewis, Joshua Crider, Amy Wanken, and Robin Roggenbeck also testified on behalf of the State. Lewis, another employee of Senior Center who often *Page 9 
drove Ms. Ridley to her appointments, testified concerning Ms. Ridley's general condition prior to the incident and described her as "very independent," "determined" and funny. Crider, a "jailhouse snitch," testified that he had a conversation with Young in March 2006 about his case "involving an elderly woman and strangulation" and that Young asked him "how could you convince a jury that you didn't mean to kill somebody." Amy Wanken, a forensic scientist in the DNA forensic biology unit at BCI, testified that she obtained a DNA profile, a mixture of at least two individuals, from Ms. Ridley's blouse. She testified that the major profile was consistent with Ms. Ridley and the minor profile was consistent with Young; however, she calculated statistics for the minor profile, and the number of population that could not be excluded from the mixture was only one in thirteen individuals. Robin Roggenbeck, a forensic scientist in the latent print section at BCI, testified that the partial latent print taken from the exterior back storm door at Ms. Ridley's home did not match Young's prints. Finally, Dr. Russell Uptegrove, who performed the autopsy on the body of Ms. Ridley, testified concerning the results of his autopsy and opined that the cause of death was anoxic encephalopathy, i.e., a cessation of oxygen to the brain, due to strangulation. The defense called Dr. Greg Balco, an expert in neuroforensic pathology, who opined that six weeks prior to her death, Ms. Ridley did not in fact suffer an anoxic or hypoxic, i.e., decreased oxygenation, encephalopathic event.
 {¶ 18} The trial court found Young guilty of aggravated burglary, in violation of R.C. 2911.11(A)(1), a felony of the first degree, and aggravated robbery, in violation of R.C. 2911.01 (A)(3), a felony of the first degree, but not guilty of the repeat violent offender specification. The court found Young not guilty of the three counts of *Page 10 
aggravated murder, but guilty of the lesser included offense of felonious assault, in violation of R.C. 2903.11, a felony of the second degree. The trial court imposed a sentence that is not relevant to this appeal.
 II. Assignments of Error
Young raises the following assignments of error:
 {¶ 19} First Assignment of Error:
 THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION OF THE DEFENDANT/APPELLANT FOR AGGRAVATED ROBERRY, AGGRAVATED BURGLARY, AND FELONIOUS ASSAULT.
 {¶ 20} Second Assignment of Error:
 DEFENDANT/APPELLANT'S CONVICTIONS FOR AGGRAVATED ROBERRY, AGGRAVATED BURGLARY, AND FELONIOUS ASSAULT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 21} Third Assignment of Error:
 DEFENDANT/APPELLANT DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL AS CONTEMPLATED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION.
 III. The Sufficiency of the Evidence {¶ 22} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. See, e.g., State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any *Page 11 
rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citing Jackson v.Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. A sufficiency of the evidence challenge tests whether the state's case is legally adequate to satisfy the requirement that it contain prima facie evidence of all the elements of the charged offense. See State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Our evaluation of the sufficiency of the evidence raises a question of law and does not permit us to weigh the evidence. See State v. Simms, 165 Ohio App.3d 83,2005-Ohio-5681, 844 N.E.2d 1212, at ¶ 9, citing State v. Martin,20 Ohio App.3d at 175.
 {¶ 23} Young contends that there is insufficient evidence to support his aggravated burglary conviction. R.C. 2911.11(A)(1) sets forth the offense of aggravated burglary and states:
 (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
"A person acts purposely when it is his specific intent to cause a certain result, or when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).
 {¶ 24} First, he argues that there is no evidence that he "trespassed" in Ms. Ridley's home or that he did so by "force, stealth, or deception." He argues that the *Page 12 
evidence reasonably shows that Ms. Ridley may have known Young due to her relationship with his mother, Andria Young, and that Ms. Ridley may have invited Young into her home. He also argues that no one saw Young enter the residence and that there was no evidence of a forced entry and no other physical evidence linking him to the doors, which were locked.
 {¶ 25} A person commits a trespass when, without privilege to do so, he knowingly enters or remains on the land or premises of another. R.C. 2911.21 (A)(1). Moreover, the privilege of an invited guest to be on the premises is terminated if he commits a violent act. See State v.Steffen (1987), 31 Ohio St.3d 111, 115, 509 N.E.2d 383. A defendant does not have to gain entrance to a structure by force in order to satisfy the force element of aggravate burglary. See State v. Divincenzo, Medina App. No. 05CA0105-M, 2006-Ohio-6330, at ¶ 23, citing State v.Steffen, supra. In Steffen, the Supreme Court of Ohio rejected the defendant's contention that the state had failed to prove the essential element of trespass to support his aggravated burglary conviction because the evidence showed that his initial entry into the victim's home was lawful, i.e., he was invited into the home. The Court reasoned that "the felony committed, once on the premises, was one of violence, directed against a human being who had the ability and the authority to revoke the privilege of initial entry, if such privilege was in fact granted as [defendant] testified." Steffen, supra, at 114-115. Thus, "even assuming lawful initial entry, the jury was justified in inferring from the evidence that [defendant's] privilege to remain in [the victim's] parents' home terminated the moment he commenced his assault on her." Id. *Page 13 
 {¶ 26} Here, even if we assume that Ms. Ridley initially invited Young into her home, the State presented sufficient circumstantial evidence to show that Young, like the defendant in Steffen, committed a violent felony offense, [1] i.e., felonious assault, against Ms. Ridley and that any privilege Young had to enter her home was terminated the moment he commenced his assault on her. Thus, the State presented sufficient evidence to prove the essential elements of "trespass" and "force" to support Young's aggravated burglary conviction.
 {¶ 27} Likewise, because we find in our following discussion on aggravated robbery that Young inflicted "serious physical harm" to Ms. Ridley, we reject his argument that there was insufficient evidence to support the finding that he inflicted "physical harm", another essential element of aggravated burglary.
 {¶ 28} Young also contends that there was insufficient evidence to support his aggravated burglary conviction because the State failed to show that Young had the requisite "purpose" to commit a criminal offense and that he "purposely" inflicted harm to Ms. Ridley. However, purpose to inflict harm is not an element of aggravated burglary; the purpose prohibited by the statute is only the purpose to commit "any criminal offense." See State v. Gardner, 118 Ohio St.3d 420, 2008-Ohio-2787. Thus, we must decide whether the state presented sufficient evidence concerning Young's purpose to commit any criminal offense, i.e., either a theft or an assault on Ms. Ridley.[2]
 {¶ 29} Purpose and intent are synonymous. See White v. Maxwell (1963),174 Ohio St. 186, 188, 187 N.E.2d 878. The purpose with which a person does an act is determined from the manner in which it is done, the means used, and all the other facts *Page 14 
and circumstances in evidence. See State v. Puterbaugh (2001),142 Ohio App.3d 185, 189, 755 N.E.2d 359. In the context of aggravated burglary, "a defendant may form the purpose to commit a criminal offense at any point during the course of a trespass." Gardner, 118 Ohio St.3d at ¶ 33, citing State v. Fontes (2000), 87 Ohio St.3d 527, 731 N.E.2d 1037, at syllabus.
 {¶ 30} Here, the facts and circumstances in evidence show that within a span of approximately 20 minutes, Young entered Ms. Ridley's home, ransacked it, and then engaged in the specific conduct of "knotting" the long ties of Ms. Ridley's blouse around her neck. Young, who weighed approximately 300 pounds, tied them so tightly around the neck of Ms. Ridley, a 95-years-old woman, that it took "quite a bit of effort and force" to get them off, which suggests that he did so intentionally. The ties restricted her breathing, rendered her "unresponsive," and she in fact "gasped" when they were removed, which suggests that Young acted with the intent of producing a specific result. The State presented sufficient evidence that Young acted with the purpose to commit both a theft and an assault against Ms. Ridley in her home. Therefore, we conclude that Young's aggravated burglary conviction is based on more than sufficient direct and circumstantial evidence.
 {¶ 31} Young contends that his felonious assault conviction is based on insufficient evidence because there was no direct evidence to show that he in fact inflicted any physical harm to Ms. Ridley. R.C. 2903.11
sets forth the offense of felonious assault and states: "(A) No person shall knowingly * * * (2) Cause serious physical harm to another[.]* * *" Under R.C. 2901.01(A)(5), the definition of "serious physical harm" includes: *Page 15 
"(b) Any physical harm that carries a substantial risk of death; (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 32} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "[W]hether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself." State v.Brown, Gallia App. No. 04CA3, 2004-Ohio-5887, at ¶ 10, citing State v.Huff (2001), 145 Ohio App.3d 555, 563, 763 N.E.2d 695. (Footnote omitted.) "The test for whether a defendant acted knowingly is a subjective one, but it is decided on objective criteria. * * * However, if a given result is probable, a person will be held to have acted knowingly to achieve it because one is charged by the law with knowledge of the reasonable and probable consequences of his own acts." State v.McDaniel (May 1, 1998), Montgomery App. No. 16221, citing State v.Elliot (1995), 104 Ohio App.3d 812, 663 N.E.2d 412 and State v.Edwards (1992), 83 Ohio App.3d 357, 616 N.E.2d 1123.
 {¶ 33} "It is beyond dispute that the state may use either direct or circumstantial evidence to prove the essential elements of an offense."State v. Reine, Scioto App. No. 06CA3102, 2007-Ohio-7221, at ¶ 23, citing Jenks at 272. Here, the State presented more than sufficient circumstantial and direct evidence to prove that Young knowingly caused serious physical harm to Ms. Ridley. *Page 16 
 {¶ 34} The evidence indicates that when Gills left Ms. Ridley's residence at 12:10 p.m., Ms. Ridley was sitting on her couch with the front door unlocked, but when Womack arrived approximately 20 minutes later, the front "security" door was locked. Then, as she looked through the glass door, Womack observed a man, whom she later recognized as Young, attempting to escape out the back door, while Ms. Ridley lay on the floor with her false teeth nearby. Though Young's mother had been Ms. Ridley's friend and caregiver, Young was not attempting to administer aid or to assist Ms. Ridley in any way. Minutes later, after Womack returned to Ms. Ridley's home with Malone, Young had fled the scene, leaving Ms. Ridley unresponsive on the floor. Ms. Ridley's breathing was described as "goggling," "shallow" and "agonal" and in fact, EMTs later determined that the long "ties" from her blouse were tightly knotted around her neck-so tight that it took "quite a lot of effort and force" to get the ties off and that Ms. Ridley "gasped" when they were removed. Summers testified that if they would have arrived much later, Ms. Ridley would have been in cardiac arrest. Due to her medical condition and because she remained "unresponsive" to medical personnel, Ms. Ridley was taken to the hospital emergency room.
 {¶ 35} We believe that this direct and substantial circumstantial evidence is more than sufficient to show that Young knowingly caused serious physical harm to Ms. Ridley. Womack positively identified Young, whom she had known for a "long time," as the individual in Ms. Ridley's home, and when asked if she had "any doubt" the man she saw was Young, Womack stated "no." Given the sequence of events, the circumstances under which he was present in Ms. Ridley's home, his location within the residence in close proximity to Ms. Ridley on the floor, his attempt to escape, his failure *Page 17 
to render assistance to Ms. Ridley, and his fleeing the scene, we conclude that there was substantial evidence from which the court could find that Young, in fact, assaulted Ms. Ridley.
 {¶ 36} The evidence also demonstrates that Young did so "knowingly" and that the injury Ms. Ridley sustained constituted "serious physical harm." The evidence shows that Young tied the long ties of Ms. Ridley's blouse in a tight knot around her neck, that the ties substantially restricted her breathing, and that Young's actions rendered Ms. Ridley "unresponsive" for a significant length of time. Based on all the surrounding facts and circumstances, we find that any reasonable person would be aware that this conduct would probably cause a certain result or would probably be of a certain nature. Ms. Ridley's resulting serious injuries, which involved some temporary, substantial incapacity, were reasonable and probable consequences of Young tying her blouse "ties" in a tight knot around her neck restricting her breathing. Accordingly, we reject Young's contention that his conviction for felonious assault was based on insufficient evidence.
 {¶ 37} Finally, Young contends that his conviction for aggravated robbery was based on insufficient evidence. R.C. 2911.01 (A)(3) sets forth the offense of aggravated robbery and provides:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (3) Inflict, or attempt to inflict, serious physical harm on another.
Under R.C. 2913.01(K), the definition of "theft offense" includes the offense of theft as set forth in R.C. 2913.02, which states: *Page 18 
 (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent; (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; (3) By deception; (4) By threat; (5) By intimidation.
 {¶ 38} Young argues that the State failed to present sufficient evidence to show that he either committed or attempted to commit a "theft offense" in Ms. Ridley's home or that he either inflicted or attempted to inflict "serious physical harm." Because we have already concluded that the State presented more than sufficient evidence to show that Young inflicted "serious physical harm" on Ms. Ridley, we reject that contention.
 {¶ 39} To prove the offense of aggravated robbery, the State was not required to show an actual theft, but merely an attempt. See R.C. 2911.01(A)(3). In State v. Davis (1978), 56 Ohio St.2d 51, 55,381 N.E.2d 641, the Supreme Court of Ohio held that "[a]n attempted theft can reasonably be assumed to have occurred from the following facts: the bedroom in which the victim was found was in disorder, the victim's purse and wallet were open, and the bedroom closet was open and appeared to have been `ransacked.'" Here, the evidence shows that Womack, who frequently visited Ms. Ridley, went through the house with Detective Charles and pointed things out that seemed to have been "disturbed." Ms. Ridley's purse was empty except for three pennies. Her wallet, which was found on a table in another room underneath a washcloth, was empty except for her Buckeye card and a Visa card; it contained no cash or coins, even though Womack had given Ms. Ridley $20.00 the previous day. Also, Ms. Ridley's bedroom appeared to be in disarray. Several dresser drawers were opened or partially opened. There was a checkbook "shipping" box normally kept in a dresser drawer on top of her dresser; the box was open, and checks and checkbook *Page 19 
registers were strewn about the dresser. Ms. Ridley kept a glass ashtray on her dresser with some money and jewelry in it. The ashtray appeared to have been dumped and the jewelry sorted through; no money was found. Ms. Ridley also had a "money jar" that was missing. Finally, according to Womack, Ms. Ridley kept a gun in the trash can next to her bed; the trash can appeared to have been moved from its normal location, and the gun was missing. While Womack had not actually seen the gun for a couple of years, Womack indicated that they had talked about the gun and joked about the "man" she slept with. We believe that the State presented sufficient evidence to allow a rational fact finder to infer that an attempted theft offense occurred here. Accordingly, we reject Young's contention that insufficient evidence supported his aggravated robbery conviction and overrule Young's first assignment of error.
 IV. Manifest Weight of the Evidence {¶ 40} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt. State v. Johnson (1991),58 Ohio St.3d 40, 41, 567 N.E.2d 266; *Page 20 State v. Eskridge (1988), 38 Ohio St.3d 56, 526 N.E.2d 304, paragraph two of the syllabus.
 {¶ 41} Even in acting as a thirteenth juror we must still remember that the weight to be given evidence, and the credibility to be afforded testimony, are issues to be determined primarily by the trier of fact.State v. Dye (1998), 82 Ohio St.3d 323, 329, 1998-Ohio-234,695 N.E.2d 763; State v. Frazier (1995), 73 Ohio St.3d 323, 339, 1995-Ohio-235,652 N.E.2d 1000. The fact finder "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony."Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273. Thus, only if the fact finder clearly lost its way and created a manifest miscarriage of justice will we interfere.
 {¶ 42} Young contends that his convictions are against the manifest weight of the evidence because other than Womack's eyewitness testimony and Young's statement to detectives, the evidence presented at trial was circumstantial and "conclusory". Young argues that the trial judge, as the trier of fact, clearly "lost its way" because he was "biased and prejudiced" by knowledge he acquired during the pretrial proceedings, particularly the hearing under Evid. R. 702 concerning the admissibility of Dr. Uptegrove's expert testimony and the hearing on Womack's eyewitness testimony.
 {¶ 43} Young's convictions are not against the manifest weight. Based upon the facts we previously discussed, the State presented more than enough substantial circumstantial and direct evidence proving the essential elements of the offenses of which Young was convicted. While Womack was the only eyewitness who placed Young at the scene, she had "no doubt" that the man she saw in Ms. Ridley's home was *Page 21 
in fact Young. Young attempted to impeach the reliability of her eyewitness identification, but determinations of credibility and weight of the testimony remain within the province of the trier of fact as long as they have some basis in reason and fact. See, State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. Given her testimony, and all of the circumstantial evidence presented in this case, any rational fact finder could have found, beyond a reasonable doubt, all of the essential elements crimes charged.
 {¶ 44} And despite Young's claims of bias, a trial court is presumed to have considered only the relevant, material and competent evidence.State v. Bays (1999), 74 Ohio St.3d 15, 28, 716 N.E.2d 1126. A judge is presumed to be unbiased and unprejudiced in the matters over which the judge presides. In re Disqualification of Olivito (1994),74 Ohio St.3d 1261, 1263, 657 N.E.2d 1361. "The term `bias or prejudice' `implies a hostile feeling or spirit of ill-will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts."' In re Disqualification of O'Neil,100 Ohio St.3d 1232, 2002-Ohio-7479, 798 N.E.2d 17, at ¶ 14, quoting State exrel. Pratt v. Weygandt (1956), 164 Ohio St. 463, 469, 132 N.E.2d 191. Here, Young offers no evidence of judicial "bias or prejudice" or any showing that the court had hostile feelings against him. Young also fails to identify any "improper" evidence that he believes the court considered.
 {¶ 45} Thus, Young fails to overcome the presumption that the trial court considered only the relevant, material and competent evidence and that it was unbiased *Page 22 
and prejudiced during the course of the bench trial. Accordingly, we overrule Young's second assignment of error.
 VI. Ineffective Assistance of Counsel {¶ 46} In his third assignment of error, Young contends that trial counsel rendered ineffective assistance of counsel by failing to request the trial judge to recuse himself and by failing to file a motion to suppress Young's statement to detectives.
 {¶ 47} In order to prevail on a claim of ineffective assistance of counsel, Young must show (1) his counsel's performance was deficient in that it fell below an objective standard of reasonable representation, and (2) the deficient performance prejudiced his defense so as to deprive him of a fair trial. State v. Smith (2000), 89 Ohio St.3d 323,327, 731 N.E.2d 645, citing Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To establish prejudice, Young must show that there exists a reasonable probability that, were it not for counsel's errors, the result of the proceeding would have been different. State v. White (1998),82 Ohio St.3d 16, 23, 693 N.E.2d 772; Bradley, at paragraph three of the syllabus.
 {¶ 48} When considering whether trial counsel's representation amounts to a deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Washington, 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id.
 {¶ 49} First, Young contends that trial counsel were ineffective because they did not request the trial judge recuse himself and failed to object to the trial court continuing *Page 23 
to hear the case after Young waived his right to a jury. Young argues that trial counsel should have "thoroughly and effectively addressed these matters on the record," and once again argues that the trial court was privy to information about the case that a trier of fact would not normally have known.
 {¶ 50} Whether to waive jury is a matter of trial strategy. State v.Campbell, Lucas App. No. L-05-1284, 2006-Ohio-4435, at ¶ 20; see, also,State v. Peterson, Franklin App. No. 07AP-303. 2008-Ohio-2838, at ¶ 56. Our review of the record shows that trial counsels' decision to try the case to the judge was a tactical decision based on a reasonable belief that the judge would be better able to "sort out" the issues concerning the cause and manner of the victim's death and thus would be more likely to find against the State on the issue of causation. Moreover, contrary to Young's assertions, his decision to waive jury and to have the judge hear the case was "thoroughly and effectively" addressed on the record:
 THE COURT: Let me be, I have done this before on sex cases and of course I know what can be considered and what can't. I just want everyone to be cognizant of the fact that I heard some pre-trial motions, lengthy motions related to cause of death, manner of death. I will make those decisions or I will base decisions in this case on evidence that I think is proper to come before the Court. What's everyone thoughts? I mean that's the risk on the issue that I have heard so many pre-trial things.
 [DEFENSE COUNSEL] MR. EACHES: Judge you're going to make the decision regardless of what the jury hears and we feel you're probably better to sort it out than a jury might be after hearing what we might think may be the wrong instructions unless the Court itself has some feeling it might be biased.
 THE COURT: No, I just wanted to bring it up. I had forgotten about it until yesterday but I had heard the eye witness issue. We have heard the issue on the expert. I mean I don't care to try it but I would like to get everyone's feelings on the record. *Page 24 
 [DEFENSE COUNSEL] MR. EACHES: It's basically our clients.
 [DEFENSE COUNSEL] MR. KNIGHT: Well yes, he has to file this in writing.
 THE COURT: He does?
 [DEFENSE COUNSEL] MR. KNIGHT: Yes, it says knowingly waives it and in writing and in open Court which, of course, we're willing to do. You can inquire of him. That's what I was doing in fact over there while you were talking is discussing with him where we are and that decisions had to be made.
 THE COURT: The only thing that I have probably said on this case is I think it's a case where the State has an up hill battle on the six weeks issue. I thought it would have been a tough case all along. My mind is open. If there's no objection I will hear it if he wants it. Any objections if I hear it from the defense?
 [DEFENSE COUNSEL] MR KNIGHT: Oh no, no objections.
 THE COURT: The State?
 [PROSECUTOR] MR. ABEL: Keep an open mind and hear all the evidence, that's all we can ask.
 [DEFENSE COUNSEL] MR. EACHES: We'll put it in your hands, Judge.
 . . .
 THE COURT: Let the record show that we're here in the courtroom outside the presence of the prospective jurors in the case of State of Ohio versus Walter Young. We were back in chambers previously. I mentioned that the defense had made a motion to waive a jury. We're now in the courtroom. I have been presented with a jury waiver. It's a signed document that says I, Walter J. Young, having been inquired of his right to trial by jury of his peers and after consideration of all his options, by his signature hereto knowingly, intelligently and voluntarily waives my right to trial by jury and requests my case be presented to and decided by the Court. It's signed by Walter J. Young.
 Mr. Young, you understand today that we have a jury present. I started to explain jury service to that panel. Prior to seating prospective jurors and beginning to ask them questions your attorneys approached me and mentioned that is was your desire and when I say your, plural, including your attorneys, to waive the jury and have your case tried to me. *Page 25 
 Do you understand that?
 MR. YOUNG: Yes sir.
 THE COURT: Do you understand that your attorneys have asked that the jurors be sent home and that your case be tried to me without the benefit of the jury, do you understand that?
 MR. YOUNG: Yes sir.
 THE COURT: Do you understand that I have heard various motions in this case dealing with eye witness identification, with issues concerning expert witnesses, case of death and that I will use my best judgment and ability to determine what evidence I should and should not consider in determining your guilt or innocence, do you understand that?
 MR. YOUNG: Yes sir, well I would assume that Your Honor would always weigh both sides of everything.
 THE COURT: You understand that with this it will be me doing it and not a jury?
 MR. YOUNG: Yes sir.
 THE COURT: And do you understand that I know probably more than what this jury would know in making a decision?
 MR. YOUNG: Yes sir.
 THE COURT: Do you understand that because of my education and experience I realize that some of the things that I know can and cannot come into the decision of guilt or innocence?
 MR. YOUNG: Yes sir.
 THE COURT: You understand that. Your attorneys have also, they're the ones that approached me. Are you satisfied with the decision that your attorneys have made in this case?
 MR. YOUNG: Yes sir.
 THE COURT: Are you satisfied with their other decisions that they've made in this case?
 MR. YOUNG: I am satisfied with my attorneys all the way down the line. *Page 26 
 {¶ 51} The court went on to further inquire of Young and thereafter determined that Young's decision to waive his right to a jury was done knowingly, intelligently and voluntarily. Based on the dialogue with trial counsel and then with Young, we conclude the trial counsel was not deficient in failing to request that the trial judge recuse himself or in failing to object to court hearing the case.
 {¶ 52} Furthermore, Young fails to show any prejudice from this decision. As we previously stated, a trial court is presumed to have considered only the relevant, material and competent evidence in a bench trial, see Bays, supra; a judge is presumed to be unbiased and unprejudiced in the matters over which the judge presides, see In reDisqualification of Olivito, supra. Thus, a trial judge need not recuse himself merely because the judge acquired knowledge of facts during a prior proceeding. State v. Addison, Franklin App. No. 03AP-1102,2004-Ohio-5154, at ¶ 16, citing State v. D'Ambrosio (1993),67 Ohio St.3d 185, 188, 616 N.E.2d 909. "`[W]hat a judge learns in his judicial capacity-whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both — is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification.'" Addison, supra, citing D'Ambrosio, in turn citing United States v. Bernstein (C.A.2, 1976), 533 F.2d 775, 785.
 {¶ 53} As we previously noted, Young fails to point to any evidence of judicial bias or prejudice or any evidence that the trial court considered improper evidence. Rather, the record affirmatively demonstrates that the trial judge was not biased or prejudiced against Young, that he understood his role as trier of fact, and that he knew he could not consider inadmissible evidence. The only comment the trial judge *Page 27 
apparently made that could be construed to suggest that the court had expressed any kind of opinion about the cases was that the State had an "uphill battle" concerning the issue of causation of the victim's death; and indeed, the trial court found Young not guilty of the aggravated murder charges. Thus, Young cannot show resulting prejudice.
 {¶ 54} Next, Young contends that trial counsel was ineffective for failing to file a motion to suppress a statement he made to detectives. The failure to file or pursue a motion to suppress does not automatically constitute ineffective assistance of counsel. State v.Madrigal (2000), 87 Ohio St.3d 378, 389, 2000-Ohio-448, 721 N.E.2d 52, citing Kimmelman v. Morrison (1986), 477 U.S. 365, 384, 106 S.Ct. 2574,91 L.Ed.2d 305; see, also, State v. Brown, 115 Ohio St.3d 55,2007-Ohio-4837, 873 N.E.2d 858, at ¶ 65. To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question. State v. Brown, 115 Ohio St.3d at ¶ 65, citing State v.Adams, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 35. Young must show that a motion to suppress would have had a reasonable probability of success. See State v. Santana (2001), 90 Ohio St.3d 513,515-516, 2001-Ohio-7, 739 N.E.2d 798; see, also State v. Chamblin, Adams App. No. 02CA753, 2004-Ohio-2252, at ¶ 34, citing State v. Nields,93 Ohio St.3d 6, 34, 2001-Ohio-1291, 752 N.E.2d 859.
 {¶ 55} Young contends that he was subjected to a "custodial interrogation" after he invoked his Miranda rights and requested an attorney. He notes that after he was detained by law enforcement in Middletown, Ohio, Detective Crapyou and Sgt. Fugate went to Middletown to transport him back to Portsmouth and that prior to leaving Middletown, he was advised of his Miranda rights and he requested an attorney. And *Page 28 
Young contends that while en route back to Portsmouth, Detective Crapyou engaged in a conversation with Sgt. Fugate that was the "functional equivalent" of an interrogation because it was reasonably likely to elicit an incriminating response from him. Thus, Young contends that his statement was elicited in violation of his Miranda rights and should have been suppressed.
 {¶ 56} In Miranda v. Arizona (1966), 384 U.S. 436, 474, 86 S.Ct. 1602,16 L.Ed.2d 694, the United States Supreme Court held that when a defendant requests an attorney, the police must stop interrogation until an attorney is present, unless the accused himself initiates further communication. If police improperly interrogate the accused after he has invoked his right to counsel, any incriminating statements are inadmissible against the accused. See Edwards v. Arizona (1981),451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378. "Interrogation" refers to either express questioning or its functional equivalent, including any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. See Rhode Island v. Innis (1980), 446 U.S. 291, 301,100 S.Ct. 1682, 64 L.Ed.2d 297. "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Id. It is not necessary to phrase the communication in the form of a question to constitute an interrogation. See State v.Knuckles, 65 Ohio St.3d 494, 496, 1992-Ohio-64, 605 N.E.2d 54. "[T]o determine whether a suspect has been `interrogated,' the heart of the inquiry focuses on police coercion, and whether the suspect has been compelled to speak by that coercion." State v. Tucker,81 Ohio St.3d 431, 436, 1998-Ohio-438, 692 N.E.2d 171. However, "[officers do not interrogate a *Page 29 
suspect simply by hoping that he will incriminate himself." Arizona v.Mauro (1987), 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458.
 {¶ 57} Detective Crapyou gave the following testimony on this issue:
 Q. Let me direct your attention to October 19, 2005, what happened on that day?
 A. I believe that was the day that we got a call from Middletown, Ohio Police Department and indicated they had picked up Walter Young on our, I think it was, aggravated burglary warrant.
 Q. Okay and what did you do in response to that?
 A. We waited until we were notified that he had signed a waiver and then I think it was the following day or so Sergeant Ben Fugate and myself went to Middletown and picked him up.
 Q. Okay, did you see the defendant there in Middletown?
 A. Yes.
 Q. And what did you do?
 A. Went ahead before we even started off read him his rights. Of course, he didn't have anything to say, shackled him up and loaded him into the vehicle and left en route back to Portsmouth.
 Q. Okay, you brought him on back to Portsmouth?
 A. Yes.
 Q. How did you get back to Portsmouth?
 A. I believe it was, I can't remember what the road was up there but we passed through Middletown to Lebanon and then Route 35 into Chillicothe and then dropped down to 23.
 Q. What if anything, of note happened on the way back?
 A. Just one of the things that caught my attention when I was speaking to Fugate Walter explained that he did not wish to talk to us. He wants an attorney, he doesn't want to talk, so we're not talking to him. We've got our own conversation going on up front and I commented that it's a long distance for him to have driven and not gotten, that's a long distance to go without being caught by police. *Page 30 
 Q. And was there any response to that?
 A. He chimed in that he had taken Route 52 in order to avoid police so he wouldn't get stopped. It's a back road, I believe he called it.
 {¶ 58} Here, there is no evidence in the record of any actual express questioning or any actual coercive practices employed by the detectives. Thus, we must determine whether there was the "functional equivalent" of an interrogation, as discussed in Innis, i.e. whether the detectives should have realized that their actions and words were reasonably likely to elicit an incriminating response from Young.
 {¶ 59} In Innis, the defendant was arrested and advised of hisMiranda rights shortly after a taxicab driver, who had been robbed by a man wielding a sawed-off shotgun, identified a picture of Innis as that of his assailant. A patrolman spotted the defendant, who was unarmed, on the street. When other police officers arrived at the scene, Innis was twice again advised of his Miranda rights, and he stated that he understood his rights and wanted to speak with a lawyer. Innis was then placed in a police car to be driven to the station in the company of three officers, who were instructed not to question him or intimidate him in any way. While en route to the station, two of the officers engaged in a conversation between themselves concerning the missing shotgun. One of the officers stated that there were "a lot of handicapped children running around in this area" because a school for such children was located nearby, and "God forbid one of them might find a weapon with shells and they might hurt themselves." Defendant interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located. Upon returning to the scene, defendant was again advised of hisMiranda rights, replied that *Page 31 
he understood those rights, but that he "wanted to get the gun out of the way because of the kids in the area in the school." He then led the police to the shotgun.
 {¶ 60} The United States Supreme Court concluded that Innis was not subjected to the functional equivalent of an "interrogation" because it could not be said that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from him. The Court noted that there was nothing in the record to suggest that the officers were aware that the defendant was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children or that the police knew that the defendant was unusually disoriented or upset at the time of his arrest. The Court further reasoned:
 The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off-hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him. Id. at 303.
 {¶ 61} The Court went on to point out that "subtle compulsion" must not be equated with interrogation; "[i[t must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Id.; see, also,Tucker, 81 Ohio St.3d at 437, fn 1. *Page 32 
 {¶ 62} Here, like in Innis, the detectives' entire conversation appears to have consisted of no more than a "few off-hand remarks." There is no evidence in the record to show that the detectives had reason to believe that Young would feel particularly compelled to suddenly chime in about the route he took to avoid police detection. And based on the record before us, we find that the detectives' actions and words were far less questionable than the "subtle compulsion" that was held not to be interrogation in Innis. See Arizona v. Maura, supra, at 528-529. Given the nature of the detectives' brief and casual conversation, we find that their comments were not the kind of "psychological ploy" that properly could be treated as the functional equivalent of interrogation. Id.
 {¶ 63} Based on the record before us, the detectives reasonably should not have anticipated that their actions or words would be likely to evoke an incriminating response. Because Young cannot demonstrate that a motion to suppress would have had a reasonable probability of success, his counsel's failure to file a motion to suppress was not deficient. Therefore, we overrule Young's third assignment of error.
 JUDGMENT AFFIRMED. *Page 33 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, P.J. McFarland, J.: Concur in Judgment and Opinion.
[1] See R.C. 2901.01(A)(9).
[2] See our discussion of "theft offense" that follows under the aggravated robbery charge. *Page 1