[Cite as *State v. Baughman*, 2010-Ohio-1259.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 1-09-38

    v.

JESSICA BAUGHMAN,                    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2009 0055

**Judgment Affirmed**

**Date of Decision: March 29, 2010**

APPEARANCES:

    *Eric J. Allen* for Appellant

    *Jana E. Emerick* for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Jessica Baughman (hereinafter "Baughman") appeals the judgment of conviction and sentence entered against her by the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} The facts relevant to this appeal are as follows. On September 29, 2008, the Call-A-Nurse hotline run by St. Rita's Medical Center received a phone call from a woman saying that a three-year-old boy, named Christopher Faulk (hereinafter "Christopher"), had hit his head and was unresponsive. The nurse told the caller to call 911, and after the call ended, because of the nature of the call, the nurse also called the Allen County Sheriff's Department to report the alleged situation. The Allen County Sheriff's Department dispatched officers and emergency personnel to 209 North Church Street in Beaverdam, Ohio, which was the location of the alleged injured child. Upon arrival at the residence, paramedics were met by a man, later identified as Jacob Jones (hereinafter "Jones"), who told them that they did not need any help. Eventually, the paramedics were allowed into the residence, at which time they found Christopher lying in the back bedroom unresponsive and covered in bruises.

{¶3} As the paramedics were placing Christopher in the ambulance, his mother, defendant-appellant, Baughman, pulled up in a car with another woman, Christina Jones, and told the paramedics and law enforcement officers that

Christopher had fallen out of a tree several times. Baughman and Christopher were taken to Lima Memorial Hospital, and he was later transferred to a hospital in Columbus, where he eventually died as the result of blunt force trauma to his head.

{¶4} As a result of the investigation of Christopher's injuries, law enforcement officers eventually arrested Jones, who subsequently pled guilty to murder, felonious assault, and child endangerment. In addition, on February 12, 2009, the Allen County Grand Jury returned a two-count indictment against Baughman charging her with the following: count one, endangering children in violation of R.C. 2919.22(A)&(E)(2)(c), a felony of the third degree; and count two, obstructing justice in violation of R.C. 2921.32(A)&(C)(4), a felony of the third degree.

{¶5} On June 29, 2009, a bench trial was held. Following the presentation of evidence, the trial court found Baughman guilty on both counts of the indictment. Baughman was then sentenced to five years imprisonment on count one, and three years imprisonment on count two, which were to run consecutively for a total of eight years.

{¶6} Baughman now appeals and raises four assignments of error. For ease of discussion, we elect to address Baughman's first and second assignments of error together.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN FINDING THAT THERE WAS SUFFICIENT EVIDENCE TO ESTABLISH HER GUILT AS TO CHILD ENDANGERMENT AND OBSTRUCTING JUSTICE**

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED IN FINDING THAT THE CONVICTIONS FOR CHILD ENDANGERMENT AND OBSTRUCTING JUSTICE WERE SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE**

{¶7} In her first and second assignments of error, Baughman argues that the trial court erred in finding that her convictions for child endangerment and obstructing justice were supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶8} The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, superseded by state constitutional amendment on other grounds as stated in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

**{¶9}** Alternatively, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. Id. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶30, citing *State v. Martin* (1983), 20 Ohio App.3d 127, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387. Further, we must be mindful that the credibility to be afforded the testimony of the witnesses is to be determined by the trier of fact. *State v. Dye* (1998), 82 Ohio St.3d 323, 329, 695 N.E.2d 763; *State v. Frazier* (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000.

{¶10} After a review of the record, we note that Baughman failed to make a Crim.R. 29 motion at the close of the State's case. Thus, she has waived all but plain error as to the sufficiency of the evidence. See *State v. Jones* (2001), 91 Ohio St.3d 335, 346, 744 N.E.2d 1163. In order to find plain error, there must be a deviation from a legal rule, the error must be an "obvious" defect in the proceedings, and the error must affect a defendant's "substantial rights." *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68. Reversal on plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage" of justice. Id.

{¶11} Here, Baughman was charged with one count of child endangerment and one count of obstructing justice. In order to prove the charge of child endangerment, the State had to prove that (1) Baughman was the parent of a minor child, (2) that she recklessly created a substantial risk to the child's health and safety by violating a duty of care, protection or support, and (3) that the violation resulted in serious physical harm to the child. R.C. 2919.22(A)&(E)(2)(c). With respect to the obstructing justice charge, the State had to prove that Baughman, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for a crime committed or to assist another to benefit from the commission of a crime, did communicate false information to a person, and the

crime committed by the person aided is aggravated murder, murder, or a felony of the first or second degree. R.C. 2921.32(A)&(C)(4).

{¶12} Prior to the presentation of the State's evidence, the defense and State stipulated to the fact that Baughman was the mother and legal custodian of the victim, Christopher. (June 29, 2009 Tr. at 3-4). In addition, they stipulated to the judgment entry of conviction and sentence of Jones, along with the death certificate for Christopher and the Franklin County Coroner's report. (Id.) Then the State proceeded to call its first witness, Rebecca Brandon. She testified that on Monday September 29, 2008, she was working at St. Rita's Medical Center's Call-A-Nurse hotline when she received a call around 9:00 a.m. from a woman named Christina Jones. (Id. at 7). The caller said that she was the aunt of a three-year-old boy, Christopher, and that Christopher had hit his head while throwing a fit and was unable to be revived. (Id. at 7-8). Nurse Brandon told the caller that they needed to call 911. (Id. at 8). After the call ended, Nurse Brandon stated that she decided to call Children Services because the call had seemed suspicious. (Id.). In addition, she called the sheriff's department to see if someone had recently placed a 911 call about a three-year old boy. (Id.). When they informed her that they had not received a call, she told them about the call, and the sheriff's office said that they would send someone out to check on the situation. (Id. at 9). While

Nurse Brandon acknowledged that she never spoke to Baughman during the call, she did state that Christina had told her that Baughman was with her. (Id. at 11).

**{¶13}** Next, Matthew Nowlan testified that he had been one of the paramedics that had responded to 209 North Church Street in Beaverdam, Allen County, regarding a possible unresponsive child. (Id. at 13-14). Nowlan said that when they got to the scene, a man (Jones) came out of the trailer and asked them what they were doing there and told them that no one had called them. (Id. at 15). Jones had asked them several times what they were doing there when Nowlan's supervisor asked Jones if there was an unresponsive child in the trailer. (Id. at 15). Jones said "yes," and told them to "wait a minute, please," at which point Jones walked back into the house and shut the door behind him. (Id.). Eventually, he came back and allowed the paramedics to come in and directed them into the back bedroom. (Id. at 16). When they arrived in the back bedroom, Nowlan said that he saw a small boy in a pair of shorts lying on the bed. (Id.). Nowlan stated that the boy was unresponsive, that his respirations were labored, and that he was covered from head to toe in bruises. (Id. at 17).

**{¶14}** Around the time when the paramedics were getting the boy out of the house and into the ambulance, a car pulled up to the house and two women got out, one of whom ran up to the ambulance and told the paramedics that she was the boy's mother, later identified as Baughman. (Id. at 20). The paramedics asked

Baughman what had happened to her son, and she responded that he had fallen out of a tree several times; in addition, she also told them that her son would get angry and would hit himself and cause bruises. (Id. at 22). Then, Baughman and the boy were transported to the hospital. (Id. at 21-22).

{¶15} Christopher died a few days later at the hospital, and Jones subsequently pled guilty and was sentenced for murder, felonious assault, and child endangerment as a result of the incident. (Id. at 1-3).

{¶16} The Chief of Police of Bluffton, Ohio, Richard Skilliter, also responded to the scene on September 29, 2008. He testified that when he arrived, the paramedics were already loading a child into an ambulance, and that Baughman was informing them that she was the boy's mother. (Id. at 32-34). Chief Skilliter asked Baughman what had happened, and she told him that her son had fallen out of a tree the other night and since then he had not been acting right. (Id. at 35). The other woman with Baughman also told him that they always had to keep an eye on the child because he would hurt himself a lot. (Id.). The Chief walked Baughman over to the ambulance and before it left he asked her again what had happened, again Baughman repeated that her son had fallen out of a tree and pointed to some trees in the distance. (Id. at 36). While Chief Skilliter was having this conversation with Baughman, he noted that Jones was "no where in our immediate area." (Id. at 37). In response to Baughman's explanation that the

boy had fallen out of a tree, Chief Skilliter and a few other law enforcement officers, along with one of the other children at the residence, walked back to the woods where this event purportedly took place. (Id. at 38).

{¶17} Sergeant Kevin Litsey with the Allen County Sheriff's Department responded to Lima Memorial Hospital to assist in the investigation of Christopher's injuries. (Id. at 48-49). When he arrived at the hospital, he introduced himself to Christopher's mother, Baughman, and asked her what had happened. (Id. at 49-50). The doctor came in around that time and also asked her what had happened. (Id.). She explained to the doctor that Christopher had fallen out of a tree the day before (Sunday), and that he had been acting fine, but then later had thrown a temper tantrum and hit his head on the linoleum floor. (Id. at 50-51). At that point, she said that Christopher became unresponsive. (Id. at 52). After the doctor left, Sergeant Litsey again asked her what had happened, and again she said that Christopher had been playing with some other children and had fallen out of a tree on Sunday, but that he had been acting normal on Sunday. (Id. at 52). Later during his questioning, Baughman added that Christopher had thrown a temper tantrum and that she had to place her hands between his head and the floor because he had been banging his head on it repeatedly. (Id. at 54).

{¶18} Sergeant Litsey spoke to the doctors and was permitted to look at some of Christopher's injuries. State's exhibit 5 included pictures of Christopher

while he was at Lima Memorial Hospital. (Id. at 54-58); (State's Ex. 5). These pictures show Christopher naked with his head completely bandaged and he is hooked up to several medical devices. (Id. at 54-58); (State's Ex. 5). In addition, along with a cut inside his upper lip, there are multiple bruises all along Christopher's back, the back and front of his legs, the upper part of his body, his upper left arm, and on both sides of his face. (Id. at 54-58); (State's Ex. 5).

{¶19} After seeing Christopher's injuries, Sergeant Litsey went back to Baughman and confronted her about her story. (Id. at 58-59). He told Baughman that he knew she was not being honest, and Baughman eventually indicated that it had been Jones that had caused the injuries to Christopher. (Id. at 59). She explained that there was a stool inside the house, that Christopher had hit his head on it, which had rendered him unconscious. (Id. at 59-60).

{¶20} Sergeant Litsey still did not believe that Baughman was telling the truth, so he continued his investigation, and interviewed her a second time on September 30, 2008, which he recorded. (Id. at 64). Sergeant Litsey started the recorded interview by telling Baughman that they had already arrested Jones for felonious assault and wanted to clarify a few things with her original story. (State's Ex. 4). Baughman told them that it all started on Saturday morning when Jones and Christina had gone to the hospital because Jones was having problems with his kidney stones. (Id.). When they got home around 1p.m., one of the other

kids told Jones that Christopher had been misbehaving and was being difficult. (Id.). This caused Jones to get angry and he start screaming at Christopher. (Id.). Then later, around dinnertime, Baughman said that Jones yelled at Christopher for forgetting to take a stool with him to brush his teeth. (Id.). Jones started pushing Christopher through the hallway into the bathroom, and when Christopher was done brushing his teeth, Baughman said that Jones made him carry the stool back and kept pushing Christopher towards the front room. (Id.). At one point, Baughman said that Jones had pushed Christopher so hard that Christopher fell and hit his head on the stool, and that Jones still made Christopher get up and squat for about ½ hour because he had been too slow. (Id.).

{¶21} At this point in the interview, Baughman said that Christopher had been fine on Saturday and that he went to bed and got up around 10:30-11:00 a.m. on Sunday and was acting normal. (Id.). Baughman said that Christopher tried to make his bed, but Jones got angry at him again and pushed him out of the bedroom and that it had looked like Christopher had hit his head on some kind of foot peg. (Id.). Despite this incident, Baughman said Christopher was not hurt and that Jones made Christopher a bowl of cereal; however, he got angry at Christopher again because he was not eating it fast enough, so Jones started shoving the food into Christopher's mouth. (Id.). After giving the rest of Christopher's cereal to the dog, Baughman said that Jones swung Christopher into

the couch and made him sit there with his hands in his lap; however, Christopher kept fussing with his hands, and Jones spanked him with the paddle. (Id.). Baughman said that Jones started to pick Christopher up again by the back of his neck, but this time Christopher threw himself down and hit his head on the back of the stool where there was not any padding. (Id.). At this point, Baughman said that Christopher was acting dazed and wobbled around, so Jones decided to give Christopher a cold bath. (Id.). Baughman said that she did not personally see the bath, but that when Jones brought Christopher back out, Christopher was unresponsive. (Id.). While she was dressing Christopher from his bath, Jones told her that Christopher was playing possum and to let him take a nap; however, Baughman said that after a few hours Christopher was still sleeping, which she thought was odd. (Id.).

{¶22} Around 2:30 p.m., Baughman said that she started asking Jones if they could take Christopher to the hospital, but Jones kept telling her "no" and that Christopher was just tired and to let him sleep. (Id.). Later that night, Baughman said that she had taken her pills, which had "knocked her out," and that Jones decided to take Christopher, who had still been lying on the couch, to his bed. (Id.). When Baughman woke up on Monday she and Christina decided to go check their debit cards, and it was at this time when Christina made the phone call to Call-A-Nurse. (Id.). Before they left Jones told them to lie about Christopher

and to say that Christopher had been playing in the woods with some kids and had fallen from a tree because Jones did not want to get involved again with Children Services and told the women that he was not going to go to prison. (Id.).

{¶23} At this point in the interview, Sergeant Litsey confronted Baughman about her version of this story, stating that not only was it different from her previous versions at the hospital, but that it was different from the version Jones had told the police. (Id.). Baughman replied that while Christopher had hit his head on the side of the couch on Saturday, and that this had knocked him out, he had recovered on Sunday because she said he had been walking around and playing. (Id.). She said that it was not until Christopher kept playing around and dropping his blanket on Sunday that Jones picked Christopher up again and dropped him resulting in Christopher hitting his head again and rendering him unconscious. (Id.). After that incident, for the rest of the day on Sunday, Baughman said that Christopher was wheezing, making "cooing" and snoring noises, and sometimes she said Christopher would talk, but she could not make out what he was saying. (Id.). Baughman said that Jones decided to give Christopher a bath to try to wake him up, but that after the bath Baughman said that Christopher looked like a "cooked noodle" and he never woke up and just laid on the couch snoring.

{¶24} Baughman was also confronted again about the multiple bruises over Christopher's body, which suggested to the police that Christopher had received a severe beating. (Id.). Baughman said that no one had ever told her about the bruises, but then admitted that Christopher had been hit with a piece of molding for about a week, and that she had personally observed Jones hit Christopher with the molding on Saturday and Sunday. (Id.). In regards to the small paddle, Baughman said that Jones had been using it on Christopher ever since Christopher and Baughman had moved in with Jones and Christina, which was about four months prior to the incident. (Id.). And with respect to the stitches found on Christopher's head, Baughman said that while she had been at a doctor's appointment, Jones had told her that Christopher had fallen out of a tree and cut the back of his head. (Id.). Baughman said that she had watched while Jones took a regular sewing needle and thread (not a suture kit) and stitched the wound on the back of Christopher's head. (Id.).

{¶25} By the end of the interview, Baughman acknowledged that it may have been Saturday (and not Sunday) when Christopher had hit his head causing him to become unconscious, and that he had been unconscious for more than a day before they made the call to Call-A-Nurse. (Id.).

{¶26} When asked why she had not told her doctor about the beatings when she had been at her doctor's appointment, Baughman replied "I don't

know." (Id.). Moreover, when asked why she had let Jones hit Christopher, Baughman replied by saying that she could not control Christopher herself and had asked Jones to help get Christopher to respect her. (Id.). In addition, Baughman said that she had lied to the police because Jones had threatened them multiple times. (Id.). Ultimately, Baughman admitted that "just about every other day Christopher received some kind of beating." (Id.). And, when asked for the last time why she had let this happen for so long Baughman replied, "I don't know." (Id.).

{¶27} Finally, Detective Sergeant Brett Lee of the Allen County Sheriff's Department testified that he was the on-scene commander for the investigation, and that while he had been at the residence one of the children handed him a broken paddle shaped piece of brown wood, which had "Old Betsy" carved on it. (Id. at 80); (State's Ex. 10). In addition, Detective Sergeant Lee stated that he also recovered a piece of brown molding about 29 inches by 2¼ inches. (Id. at 84); (State's Ex. 11). Ultimately, Detective Sergeant Lee discovered that Jones had used these items, as disciplinary tools, on Christopher, and that Christopher's body had corresponding injuries that matched the shape on the paddle with the holes on the back side of his legs and buttocks. (Id. at 85, 88). Moreover, he stated that in response to the initial explanation given to him by Baughman – that Christopher had fallen out of a tree – he and other law enforcement officers went out to a small

wooded area out behind the residence, photographed everything around the scene, and collected what they thought was potential evidence. (Id. at 89). It was later determined that the story that Christopher had fallen out of a tree was not true, and that Baughman had lied in order to keep Jones from getting into trouble; however, Detective Sergeant Lee did not know whether Jones had coerced Baughman into lying for him. (Id. at 90, 93-94).

{¶28} First, with respect to the child endangerment charge, Baughman argues that when reviewing the record it is hard to determine that she knew Jones was dangerous and that she disregarded this knowledge and violated her duty of care to Christopher. We disagree. A parent has a duty to protect her child from physical abuse, and Baughman violated that duty by taking no action to prevent the abuse despite knowledge of the abuse. *State v. Hlavsa* (June 15, 2000), 8th Dist. No. 76220 (failure to protect a child from physical abuse can be child endangering); *State v. Legg* (1993), 89 Ohio App.3d 184, 187, 623 N.E.2d 1263 (child endangering conviction supported by sufficient evidence when parent with knowledge that son being beaten did nothing). The record is full of examples where Baughman violated her duty to protect Christopher from abuse and recklessly created a substantial risk of harm to Christopher. It is undisputed that Baughman was the mother and legal custodian of Christopher, and that Christopher died as a result of blunt force trauma to his head. (June 29, 2009 Tr.

at 2-4); (State's Ex. 2). Moreover, she admitted in her second interview with the police that she had known that Jones had been beating Christopher for about four months, since the time when they first moved in with Jones and Christina. She knew that Jones had not only used an old wooden paddle on Christopher, but had also at times used a smaller, thinner piece of molding. In addition to the blunt force trauma to Christopher's head (which ultimately caused his death), the State's exhibits of Christopher's body at the hospital depict multiple bruises that correspond to the molding and paddle instruments testified to by Baughman. (State's Exs. 5, 10, 11).

{¶29} Baughman admitted that she had the opportunity to tell someone that Jones was physically abusing Christopher when Jones was not present. She had an opportunity to tell her doctor during her appointment, but she said that she "didn't know" why she did not reveal this information. Instead when she came home from her doctor's appointment, she was told by Jones that Christopher had fallen out of a tree and as a result had cut his head. Again, instead of taking some kind of action to protect Christopher, Baughman allowed Jones to stitch up Christopher's cut using a regular needle and thread.

{¶30} Finally, the last incident, which lasted at least two days, Baughman said that she watched Christopher get yelled and screamed at, and pushed and thrown around by Jones. Baughman said that she was present during these

physical and verbal assaults, but again did not take any action to protect Christopher, and as a result, eventually one of Jones' physical acts caused Christopher serious physical harm when he hit his head and was rendered unconscious. In addition to not taking any action to protect Christopher from Jones' physical and verbal abuse, Baughman also did not take any action to protect Christopher when he was unconscious. Baughman said that for most of Sunday Christopher was wheezing, making "cooing" and snoring noises, that sometimes Christopher would talk, but she could not make out what he was saying, and that he looked like a "cooked noodle" and he never woke up again. Baughman did say that she *told* Jones that she thought Christopher needed to go to the hospital, but Jones told her "no" and that Christopher just needed to sleep. Baughman even thought it was odd that Christopher had been sleeping most of the day on Sunday, but it was not until Monday morning, a day later, when an attempt was made to get Christopher medical help when Christina and Baughman made a phone call to the Call-A-Nurse hotline. Despite this call and the subsequent medical treatment, Christopher died as a result of the blunt force trauma to his head.

{¶31} Therefore, after reviewing all of the evidence in a light most favorable to the State, we believe it was reasonable for the trial court as the trier of fact to have concluded that Baughman recklessly created a substantial risk to Christopher's health and safety by violating a duty of care, protection or support,

and that the violation resulted in serious physical harm to Christopher; and therefore, that the essential elements of child endangerment were proven beyond a reasonable doubt. Moreover, we cannot say that the trial court lost its way in considering and weighing the evidence presented. Thus, we find that there was sufficient evidence to support the child endangerment finding of guilt and that the finding was not against the manifest weight of the evidence.

{¶32} With respect to the obstructing justice charge, Baughman claims that there was insufficient evidence to show that she purposefully lied to law enforcement. In particular she claims that none of the law enforcement officers believed her story from the beginning, and that it is unclear from the record whether she had lied to prevent Jones' apprehension or whether she was trying to protect herself from Jones because she was scared of Jones. We disagree. Even though the law enforcement officials had suspicions with Baughman's initial explanation of Christopher's injuries, that he had fallen out of a tree, they still investigated the situation. They went out to the wooded area in question, took pictures of the scene, and gathered what they thought were important pieces of physical evidence. Even though law enforcement was not substantially delayed from discovering that Jones was the primary suspect, Baughman knew from the beginning what had been going on between Christopher and Jones; moreover, Baughman knew that Jones had asked them to lie because he did not want to go

back to prison, but still chose to lie to not only the law enforcement officials, but to the paramedics and doctors who were treating her son.

{¶33} Baughman claims that the State failed to prove that her lies about Christopher's injuries were told with the purpose to prevent Jones' apprehension. It is difficult to prove a person's subjective mental state through direct evidence, thus "[i]t must ordinarily be proven by reference to the surrounding facts and circumstances." *State v. Volgares* (May 17, 1999), 4th Dist. No. 98CA6, at *5, quoting *State v. Clark* (1995), 101 Ohio App.3d 389, 405, 655 N.E.2d 795. See, also, *State v. Austin* (1976), 52 Ohio App.2d 59, 68, 368 N.E.2d 59 (intent is a "question of fact that can be inferred from what the defendant did or said"). While it may have been true that Baughman was scared of Jones, we believe that it could have been inferred from the evidence that her real intent was to prevent Jones' apprehension. There were several times when Baughman had the opportunity to tell someone the real story when Jones was not around. She could have told Chief Skilliter when he was helping her into the ambulance; she could have told the doctor who was treating her son at the hospital; and, she could have told Sergeant Litsey when he was interviewing her at the hospital. In none of those interactions was Jones present, but Baughman still did not reveal that it had been Jones that had beaten Christopher and caused his injuries.

{¶34} Moreover, we note that even when she was told by law enforcement officials that Jones had been arrested, Baughman still managed to tell versions of a story that were less damaging to Jones. For example, in the beginning of her second interview, Baughman told the police that Christopher had not become unconscious until Sunday late afternoon, but later admitted that the severe hit had happened much earlier and that Christopher had been left unconscious for a much longer period of time. Finally, Baughman initially told the police that, even though Jones had lifted Christopher into the air, it had been Christopher who had dropped himself out of Jones' grasp and hit his head on the back of the stool where it was not padded and became disoriented and later became unconscious. Nevertheless, Baughman later admitted that it was Jones that had caused Christopher to become unconscious by pushing him into the stool causing Christopher to hit his head.

{¶35} Overall, from this evidence, we believe that it was reasonable for the trial court as the trier of fact to have concluded that Baughman had lied to the law enforcement officers about the real cause of Christopher's injuries in an effort to cover-up Jones' involvement and to prevent his apprehension; and therefore, the trier of fact could have concluded that the essential elements of obstructing justice were proven beyond a reasonable doubt. Furthermore, we cannot say that the trial court lost its way in considering and weighing the evidence presented. Thus, we

find that there was sufficient evidence to support the obstructing justice finding of guilt and that the finding was not against the manifest weight of the evidence.

{¶36} Baughman's first and second assignments of error are, therefore, overruled.

**ASSIGNMENT OF ERROR NO. III**

**APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT TO THE FEDERAL CONSTITUTION MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT**

{¶37} In her third assignment of error, Baughman argues that she was denied effective assistance of trial counsel when her attorney waived her right to a jury trial and her case proceeded to a bench trial.

{¶38} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole* (2001), 92 Ohio St.3d 303, 306, 750 N.E.2d 148, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶39} In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide

range of reasonable professional assistance. *State v. Sallie* (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 141-42, 538 N.E.2d 373, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

{¶40} Here, Baughman claims that she was denied effective assistance of counsel when her trial attorney waived her right to a jury trial, which resulted in "collateral consequences" and prejudiced her. (Appellant's Brief at 11). However, whether or not to waive jury is a matter of trial strategy, and even if we do not agree with the wisdom of trial counsel's decision, debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. *State v. Campbell*, 6th Dist. No. L-05-1284, 2006-Ohio-4435, ¶20, citing *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643. See, also, *State v.*

Case No. 1-09-38

*Young*, 4th Dist. No. 07CA3195, 2008-Ohio-4752, ¶50; *State v. Peterson*, 10th Dist. No. 07AP-303, 2008-Ohio-2838, ¶56. In this particular case, given the severity of the injuries to the victim, the age of the victim, and the nature of the relationship between the defendant and the victim, we believe that it was a reasonable decision by Baughman's trial counsel to waive trying the case to a jury and to try the matter to the court.

**{¶41}** Additionally, Baughman briefly mentions that the colloquy given by the trial court in discussing her waiver of her right to a jury trial was somehow insufficient and should have been more explicit in assuring that she knew the full ramifications of waiving her right to a jury. We disagree. At the pre-trial hearing, the following conversation occurred:

> **[Defense Counsel]: We are here today to enter in writing and on the record a waiver of our – of jury trial and requesting this matter be tried to the court.**
> **The Court: Miss Baughman, is this your understanding?**
> **Miss Baughman: Yes.**
> **The Court: You'll have to speak up.**
> **Miss Baughman: Yes, sir.**
> **The Court: You understand that you have a constitutional right to a trial by jury and to determine this case – if it go to trial by jury that it'd be twelve (12) individuals that would hear this case and decide guilt or innocence. You understand?**
> **Miss Baughman: Yes, sir.**
> **The Court: And you understand that you'll be waiving trial by jury and have this matter tried by the court?**
> **Miss Baughman: Yes, sir.**
> **The Court: The Court has prepared a waiver of jury. And the Court has before it a waiver of jury that says, "I, Jessica Baughman, defendant in the above case, hereby voluntarily**

-25-

> **waive or relinquish my right to a trial by jury and elect to be tried by a judge in – of the court in which said cause may be pending. I fully understand under the laws of this state, I have a constitutional right to a trial by jury." And the trial to the court would be scheduled for the same date that had been previously scheduled, which would be June 29th. And there's a signature of Jessica A. Baughman. Is this your signature?**
> **Miss Baughman: Yes, sir.**
> **The Court: And did you execute this waiver of jury here today in open court?**
> **Miss Baughman: Yes, sir.**
> **The Court: Very well. The waiver will be filed with the clerk's office. It'd be so ordered. And this matter shall proceed to a trial to court on Monday, June the 29th at 8:45.**

(May 27, 2009 Tr. at 1-3); (Doc. No. 38). Not only did the trial court make sure on the record that Baughman understood her constitutional right to a jury, but Baughman also signed a written waiver, further demonstrating that she had been notified about her right to a jury that she was foregoing. We find that the colloquy and the written waiver were sufficient to notify her about the jury trial right that she was foregoing. *State v. Barnett*, 1st Dist. No. C-060950, 2007-Ohio-4599, ¶6 (finding that defendant's execution of a written jury trial waiver and guilty plea form, as well as her on-the-record colloquy with the trial court about these documents, was sufficient to notify her about the jury trial right she was foregoing).

{¶42} Overall, besides Baughman's general assertions that her trial counsel was ineffective, Baughman has failed to specifically show how her trial counsel's performance was deficient or how she was prejudiced because her case was tried

-26-

to the court. Therefore, we find that Baughman was not denied effective assistance of counsel.

**{¶43}** Baughman's third assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. IV**

**THE FEDERAL SUPREME COURT CASE OF *OREGON V ICE* [sic] HAS EFFECTIVELY OVERRULED *STATE V FOSTER* [sic] REQUIRING TRIAL COURTS TO MAKE 2929.14 DETERMINATIONS**

**{¶44}** In her last assignment of error, Baughman argues that the United States Supreme Court decision in *Oregon v. Ice* (2009) __ U.S. __, 129 S.Ct. 711, 172 L.Ed.2d 517, overruled the Ohio Supreme Court's decision in *State v. Foster* (2006), 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. As a result, Baughman claims that the old sentencing scheme, which required judges to make specific findings before imposing consecutive sentences and which was overruled by the Ohio Supreme Court in *Foster*, has now been re-established by *Oregon v. Ice*, and thus she is entitled to a new sentencing hearing under the old sentencing scheme.

**{¶45}** In *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, the Ohio Supreme Court declared that those portions of the felony sentencing statutes that required judicial fact-finding before the trial court could impose a prison sentence were violations of the Sixth Amendment pursuant to *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, and *Apprendi*

*v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. 2006-Ohio-856, at ¶100. Subsequently, the Supreme Court excised those provisions that related to judicial fact-finding from the sentencing statutes, specifically including R.C. 2929.14(E)(4) and R.C. 2929.41(A). Id. at ¶97. As a result of the excision of those unconstitutional provisions, the Court ultimately held that, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus.

{¶46} Recently, in *Oregon v. Ice*, the United States Supreme Court examined an Oregon statute that required judges to find certain facts before imposing consecutive rather than concurrent sentences. 129 S.Ct. at 714-20. The Supreme Court upheld the constitutionality of the Oregon statute and found that it did not violate the Sixth Amendment concerns set out under *Apprendi* and *Blakely*. Id. at 719. Ultimately, the Supreme Court stated that, in light of historical practices and the right of states to administer their criminal justice systems, the Sixth Amendment did not prevent states from allowing judges, rather than juries, to make any finding of facts necessary to the imposition of consecutive, rather than concurrent, sentences. Id. at 716-20.

{¶47} This Court recently addressed this exact issue in *State v. Blackburn*, 3d Dist. No. 5-09-18, 2009-Ohio-5902, ¶¶6-11, appeal accepted for review in State v. Blackburn, 124 Ohio St.3d 1505, 2010-Ohio-799, __N.E.2d __. We stated that several other districts have acknowledged the *Oregon v. Ice* decision, but have found that until the Ohio Supreme Court fully reviews and ultimately reverses its *Foster* decision, *Foster* remains binding upon this Court. *State v. Robinson*, 8th Dist. No. 92050, 2009-Ohio-3379; *State v. Franklin*, 10th Dist. No. 08AP-900, 2009-Ohio-2664, appeal accepted for review in *State v. Franklin*, 123 Ohio St.3d 1422, 2009-Ohio-5340, 914 N.E.2d 1063; *State v. Krug*, 11th Dist. No. 2008-L-085, 2009-Ohio-3815; *State v. Miller*, 6th Dist. No. L-08-1314, 2009-Ohio-3908. Moreover, we noted that recently in *State v. Elmore*, 122 Ohio St.3d 472, 2009-Ohio-3478, 912 N.E.2d 582, the Ohio Supreme Court briefly discussed *Oregon v. Ice*. While the Court did not fully address the full ramifications of *Oregon v. Ice*, because neither party had briefed the issue before oral argument, in its affirmance of the trial court's authority to impose consecutive sentences on the defendant, the Ohio Supreme Court stated that "*Foster* did not prevent the trial court from imposing consecutive sentences; it merely took away a judge's duty to make findings before doing so." Id. at ¶36. Thus, although the Court has not yet fully analyzed the implications of *Oregon v. Ice* as it relates to *Foster*, it appears that it has still continued to follow the principles set forth in *Foster*. See *State v. Crosky*,

10th Dist. No. 09 AP 57, 2009-Ohio-4216, at ¶8. Therefore, as we stated in *Blackburn*, unless the Ohio Supreme Court fully addresses *Oregon v. Ice* and overrules its decision in *Foster*, *Foster* remains binding law in the state of Ohio. *Blackburn*, 2009-Ohio-5902, at ¶¶6-11

{¶48} Baughman's fourth assignment of error is, therefore, overruled.

{¶49} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**

**/jlr**

**ROGERS, J., concurring separately.**

{¶50} I concur with the opinion of the majority. I write separately only to remain consistent with my previously stated position on stipulations in criminal cases. The majority notes that the parties in this case stipulated to certain matters which included elements of the charged offenses. As I stated in my dissent in *State v. McCullough*, 3d Dist. No. 12-07-09, 2008-Ohio-3055, ¶¶44-58, I believe it is necessary for a trial court to fully comply with the requirements of Crim.R. 11 prior to accepting or admitting a stipulation of the parties which includes an element of a criminal offense. I remain convinced in that opinion.

**{¶51}** That being said, a review of the record in this case demonstrates that evidence was presented during the trial on each element of the offenses. Therefore, the fact that the parties attempted to stipulate to various issues in this case is immaterial, and I join in affirming the judgment of the trial court.

jlr