[Cite as *State v. Caudill*, 2025-Ohio-787.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

JACQUELINE M. CAUDILL,

    DEFENDANT-APPELLANT.

CASE NO. 17-24-08

O P I N I O N

---

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

JACQUELINE M. CAUDILL,

    DEFENDANT-APPELLANT.

CASE NO. 17-24-09

O P I N I O N

---

**Appeals from Shelby County Common Pleas Court
Criminal Division
Trial Court Nos. 23CR000056 and 23CR000059**

**Judgments Affirmed**

**Date of Decision: March 10, 2025**

---

APPEARANCES:

*Michael J. Scarpelli* **for Appellant**

*Madison S. Brinkman* **for Appellee**

**MILLER, J.**

{¶1} Defendant-Appellant, Jacqueline M. Caudill ("Caudill"), appeals from the June 26, 2024 judgments issued by the Shelby County Court of Common Pleas in two criminal cases brought against her. Caudill argues her convictions for obstructing justice, assault on a police officer, and resisting arrest were not supported by sufficient evidence and were against the manifest weight of the evidence. She also argues the trial court clearly erred by allowing allegedly improper remarks during the State's opening statement and closing argument. For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  Indictments and Consolidation for Trial

{¶2} On February 16, 2023, in trial court case number 23-CR-56, the Shelby County grand jury indicted Caudill on a single count of obstructing justice, in violation of R.C. 2921.32(A)(1), a fifth-degree felony. This count arose from an incident that occurred on January 26, 2023. Then, on March 2, 2023, in trial court case number 23-CR-59, the Shelby County grand jury indicted Caudill on four additional counts arising from separate incidents: (a) intimidation of a witness in a criminal case, in violation of R.C. 2921.04(B)(1), a third-degree felony; (b) obstructing justice, in violation of R.C. 2921.32(A)(6), a third-degree felony; (c) assault, in violation of R.C. 2903.13(A)(5), a fourth-degree felony; and (d) resisting arrest, in violation of R.C. 2921.33(A), a second-degree misdemeanor.

{¶3} On January 30, 2024, the trial court granted Caudill's motion for severance and separate trials. The trial court severed the first two counts in case number 23-CR-59, and it consolidated the last two counts in case number 23-CR-59 with the single count in case number 23-CR-56 for purposes of trial.

{¶4} On May 14-15, 2024, the case proceeded to a jury trial on those three counts: (1) obstructing justice from case number 23-CR-56; (2) assault on a police officer and (3) resisting arrest both from case number 23-CR-59. The assault and resisting arrest charges arose together from a separate, but related, incident from the obstructing justice charge. Both incidents were captured on multiple law enforcement body cameras, and video clips from those cameras were played for the jury and admitted into evidence at the trial. At the time of the incidents, Caudill was the fiancé of Joseph Yelton ("Yelton").

**B.      January 26, 2023**

{¶5} The obstructing justice charge arose from an interaction between Caudill and law enforcement on January 26, 2023 at Yelton's mother's residence. The residence was one of three apartments in a one-level apartment building. It was a very small apartment, with two bedrooms, two exterior doors (front and back), and only three interior doors. That evening, law enforcement officers arrived to serve Yelton with an arrest warrant. While one officer was stationed at the rear of the apartment in case someone tried to exit, three other officers approached the front door.

**{¶6}** At 7:42 p.m., Caudill opened the front door in response to knocking by an officer. Upon being asked if Yelton was at the house, Caudill responded "no." (State's Exhibit 1). The officer explained to Caudill that the truck Yelton sometimes drove was parked in front of the apartment and they were there to serve Yelton with "paperwork." Caudill engaged the officers in conversation for a few minutes, during which she asked if they were going to arrest Yelton. The officer responded that, if the paperwork was an arrest warrant then absolutely they would, to which Caudill replied: "Well, that's not gonna f****** happen." (*Id.*). Caudill subsequently told the officers multiple times that Yelton was not at the apartment. When directly asked where Yelton was, Caudill responded that she did not know. During the conversation, Caudill indicated that she either knew or highly suspected that the officers were there to arrest Yelton. For example, she specifically asked one officer, "What's the f****** arrest for, Martin?" to which that officer responded, "It's more charges for what you are already aware of." (*Id.*).

**{¶7}** After Caudill closed the door on them, the officers still believed Yelton was actually in the apartment, so they stayed in the area to surveil. Two of the officers went to an unmarked police vehicle on the street, between the apartment and a nearby Marathon gas station. One officer testified that the apartment was so close to that gas station that you could see the entire front of it from the gas station. According to one of the surveilling officers, they watched the front of the apartment and never saw anyone walking up or down the street or Yelton entering the

apartment. A third officer, who also was conducting surveillance, parked on the same street for a short period and drove up and down the street, before departing. That officer likewise never saw anyone walking in the area.

**{¶8}** Only 21 minutes after Caudill had closed the door on the officers, paramedics received a call to come to the apartment because Yelton's mother was having trouble breathing. Paramedics arrived at 8:18 p.m. and entered the residence. One paramedic at the scene testified that Yelton emerged from a bedroom within the apartment. Yelton was arrested in the living room shortly thereafter. At trial, another body-camera video was played that depicted a portion of this scene.

**{¶9}** At trial, Yelton testified he was at his mother's house that day and came there with Caudill in the truck, but he could not recall when they had arrived. According to Yelton, at one point he left to smoke a marijuana cigar and walk down the street, but he again could not recall what time that happened. Yelton admitted he has brain damage and that the marijuana cigar may have made it difficult for him to remember what happened during this time. Yelton also testified that, when he left to smoke, he went out the front door, walked around the parking lot in front of the apartment while smoking, walked down the street to the Marathon gas station, and—after finishing the cigar—walked back to the apartment and went in its front door. Yelton said that he then fell asleep in one of the two bedrooms, and he woke up to a siren and paramedics in the residence. The police soon arrived and arrested him.

{¶10} Yelton's mother testified that she did not actually see Yelton leave the residence that evening, but, when the officers first arrived, it had been "awhile" since she had seen him. She thought he had left out the back door, but could not say for certain.

{¶11} Finally, Caudill testified she and Yelton had arrived at the apartment together that day. She said that Yelton left, but admitted she did not know if she actually saw him leave or not. According to Caudill, she knew that Yelton had left to smoke and claimed that he was not present because she had looked around the residence—although she did not check in one of the two bedrooms. Caudill acknowledged that Yelton testified he had returned to the residence through the front door and that she was sitting in the living room—the very room into which the front door opens. However, according to Caudill, she did not see Yelton until he emerged from one of the two bedrooms when the paramedics arrived. She admitted she "didn't want law enforcement to arrest" Yelton, adding that "[n]obody wants nobody to get arrested." (Trial Tr. at 318).

### C. February 24, 2023

{¶12} The assault on a police officer and resisting arrest charges arose from an interaction between Caudill and law enforcement on February 24, 2023, while law enforcement officers were in the process of searching her house pursuant to a search warrant. Video from an officer's body camera showed Caudill arriving at her house during the search. She proceeded to have a conversation with Sidney

Police Department officer Sean Martin ("Officer Martin"), during which Officer Martin told Caudill to give the officers her cell phone.[1] Caudill responded with a refusal; Officer Martin told her, "Well, then I am going to arrest you and take your cell phone"; Caudill retorted, "Oh really?"; and Officer Martin told her, "Yes." (State's Exhibit 5; State's Exhibit 6). Caudill then pulled a cell phone out of her pocket and started touching it, put it back in her pocket, and told Officer Martin, "I can f****** do whatever I want with my G** d*** phone." (*Id.*). Caudill took the phone out of her pocket and threw it at Officer Martin's head. Officer Martin testified the phone was heading toward his face when he blocked it with his arm. At the time, Caudill was only about four feet from Officer Martin. Another officer, who was standing just a few feet away at the time, corroborated Officer Martin's testimony that the phone would have hit him in his face.

{¶13} Immediately after Caudill threw the cell phone at Officer Martin, she pushed an approaching officer, who was informing Caudill that she was being arrested. Caudill responded, "No, I'm not. Get the f*** off me you piece of s***." (*Id.*). After warning the struggling Caudill—who kicked that officer—that she could get stunned, Caudill replied: "I don't give a f***. If you f****** stun me, dude, I am gonna f****** kick in your mouth." (*Id.*). Ultimately, Caudill was subdued.

---

[1] At trial, Officer Martin testified that Caudill's cell phone was subject to the search warrant.

{¶14} At trial, Caudill testified that she had taken her phone out of her pocket in order to call her father, the officers came at her and were grabbing her, so she threw her phone. Although she admitted she threw the cell phone with force, she testified that she did not intend to hit anyone. She also testified that she did not hear an officer tell her that she was under arrest, despite the body-camera video capturing that statement and her responding to it. She admitted on cross-examination that the video shows she was on the ground kicking and that she screamed and kicked one of the officers while he was arresting her. For his part, Yelton testified that he was in the back of the police cruiser when this incident happened and witnessed it. He testified that Caudill "thr[e]w her phone up in the air" and it did not hit anyone. (Trial Tr. at 150).

{¶15} The jury found Caudill guilty on all three counts. On June 26, 2024, the trial court sentenced Caudill to five years of community control as to each count. This appeal followed.

## II. ASSIGNMENTS OF ERROR

{¶16} Caudill raises three assignments of error for our review:

### First Assignment of Error

**The trial court committed plain error by allowing the State's improper comments during opening statements and closing arguments.**

### Second Assignment of Error

**Ms. Caudill's convictions are not supported by sufficient evidence.**

**Third Assignment of Error**

**Ms. Caudill's convictions are against the manifest weight of the evidence.**

### III. DISCUSSION

{¶17} We address the assignments of error out of order in a manner that facilitates our analysis.

#### A. Second Assignment of Error

{¶18} In the second assignment of error, Caudill argues that the State failed to present sufficient evidence to sustain the verdicts for any of the three counts.

##### 1. Standard of Review

{¶19} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Dent*, 2020-Ohio-6670, ¶ 15. Thus, our review is de novo. *Id.* A sufficiency challenge disputes whether a party met its burden of production at trial. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Dent* at ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Thus, "[i]n assessing the sufficiency of the evidence, we do not resolve evidentiary conflicts or assess the credibility of witnesses." *State v. Jackson*, 2023-Ohio-2193, ¶ 26 (3d Dist.); *see also Jenks* at 279.

### 2. Applicable Law and Analysis

### i. Obstructing justice

{¶20} First, concerning the obstructing justice offense, Caudill argues "there was substantial evidence to support the conclusion that Ms. Caudill truthfully told the officers that Yelton had left the residence and she did not know his whereabouts at the time." (Appellant's Brief at 11). She points to her own testimony that Yelton had left the residence to smoke, as well as Yelton's corroborating testimony that he had gone outside to smoke marijuana and walk down the street.

{¶21} The obstructing justice statute provides, in relevant part, that "[n]o person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime . . . shall . . . [h]arbor or conceal the other person." R.C. 2921.32(A)(1). We have explained that "the true heart of obstructing justice pursuant to [R.C.] 2921.32(A)(1) is the defendant's intent to hinder the apprehension or discovery, etc. of a person believed to have committed a crime." *State v. Blanton*, 2015-Ohio-4620, ¶ 33 (3d Dist.). There is no requirement that the defendant's conduct actually hinder the police, and—unlike subdivision (A)(5) of the statute—there is no requirement that the defendant make a misstatement or false statement. *Id.* at ¶ 32-33; R.C. 2921.32(A)(5).

{¶22} With respect to the offense's state-of-mind requirement, "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature,

-10-

regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). Intent lies within the privacy of a person's own thoughts. *Blanton* at ¶ 30 (affirming obstructing justice conviction). "It is difficult to prove a person's subjective mental state through direct evidence." *State v. Baughman*, 2010-Ohio-1259, ¶ 33 (3d Dist.). "As a result, intent can be proven by the surrounding facts and circumstances of the case." *Blanton* at ¶ 30; *see also Baughman* at ¶ 33.

**{¶23}** We find the evidence presented, when viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt—specifically, that Caudill concealed Yelton with purpose to hinder his discovery or apprehension for crime. After learning the police were there to arrest Yelton, Caudill told the officers she had arrived and been with him at the apartment but denied multiple times that Yelton was there; Caudill never mentioned to the police that Yelton had left the apartment to smoke, as she claimed at trial; and, multiple police officers testified they surveilled the apartment and surrounding area from the time they spoke with Caudill until Yelton was found inside the very small apartment a mere 25 minutes later. Thus, there was sufficient evidence to show Yelton had been in the apartment the entire time and to reasonably infer from the surrounding facts and circumstances that Caudill knew that.

### ii. Assault on a police officer

{¶24} Turning to the assault-on-a-police-officer offense, Caudill attacks the state-of-mind element. She specifically says "the jury clearly lost its way in finding that Ms. Caudill *knowingly* caused or attempted to cause physical harm to a police officer." (Emphasis in original.) (Appellant's Brief at 10). She relies on testimony from Yelton, who witnessed the incident from the back of a police vehicle.

{¶25} Criminal assault occurs when a person knowingly causes, or attempts to cause, physical harm to another. R.C. 2903.13(A). The assault is a fourth-degree felony when the victim is a police officer. R.C. 2903.13(C)(5)(a). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). The term "physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶26} After examining the evidence in a light most favorable to the prosecution, we conclude that the evidence was more than sufficient to prove Caudill acted knowingly. The body-camera video showed that Officer Martin told Caudill she was going to have to give the officers her cell phone, she refused and pulled her cell phone out of her pocket, wound up with officers approaching her, and threw the phone with force at Officer Martin's face from only a few feet away— only striking him in the arm instead of the face because he was able to deflect it.

Body-camera videos and officer testimony demonstrate Caudill knowingly caused or attempted to cause physical harm to a police officer when she threw her cell phone—overhand with force—at Officer Martin and struck him. *See State v. Browne*, 2024-Ohio-5758, ¶ 13-18 (3d Dist.) (evidence was sufficient to convict defendant of assault on a police officer where the defendant shouted obscenities, closed his fist, and flailed his arms, striking the officer).

### iii. Resisting arrest

{¶27} Finally, regarding the resisting-arrest offense, Caudill once again attacks the state-of-mind element. She contends "there was substantial evidence negating the notion that Ms. Caudill either recklessly or forcibly interfered with her own arrest." (Appellant's Brief at 11).

{¶28} The statute for resisting arrest provides that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." R.C. 2921.33(A). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). The term "'force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1); *see also State v. Pierce*, 2017-Ohio-4223, ¶ 19 (3d Dist.) (finding sufficient evidence that defendant employed force against the police). An arrest is

lawful if the surrounding circumstances would give a reasonable police officer cause to believe that an offense has been or is being committed. *Pierce* at ¶ 21.

**{¶29}** After examining the evidence in a light most favorable to the prosecution, we conclude that the evidence was more than sufficient to prove Caudill acted either recklessly or by force in resisting or interfering with her arrest. The body-camera footage admitted into evidence at trial showed that, immediately after Caudill had thrown her cell phone at Officer Martin, she pushed an approaching officer who was informing her that she was being arrested. Caudill also kicked that officer in the ensuing struggle.

**{¶30}** Caudill's second assignment of error is overruled.

**B.** **Third Assignment of Error**

**{¶31}** In the third assignment of error, Caudill asserts that the convictions for each of the three counts were against the manifest weight of the evidence.

**1.** **Standard of Review**

**{¶32}** The "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Messenger*, 2022-Ohio-4562, at ¶ 26. "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168. Yet, "[o]nly in exceptional cases, where the

evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur. Ohio Const., art. IV, § 3(B)(3).

### 2. Analysis

**{¶33}** After reviewing the record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that none of Caudill's convictions were against the manifest weight of the evidence. In resolving conflicts in the evidence, the jury did not clearly lose its way or create such a manifest injustice that we must reverse the convictions. The jury was able to watch videos of the incidents and hear testimony from virtually all the participants in the events at issue.

**{¶34}** We note that the testimony upon which Caudill relies to support her argument regarding the obstructing justice offense is internally conflicting. While Yelton's mother testified she thought Yelton had left through the back door (and never actually saw him leave the apartment), Yelton testified that he both left and returned through the front door when he went to smoke a marijuana cigar while walking down to the gas station and back. The officers' testimony concerning their surveillance and never seeing Yelton reenter the apartment cast serious doubt as to the truthfulness of Yelton's testimony. Caudill's trial testimony that Yelton left the

apartment at some point to go smoke was incompatible with her failure to mention this detail to the officers when they arrived looking for Yelton and she denied he was in the apartment.

{¶35} Ultimately, despite being presented with two different scenarios concerning Caudill's mental state for each of the three offenses, the jury did not clearly lose its way or create a manifest miscarriage of justice in resolving conflicts in the evidence. *See State v. Sergent*, 2019-Ohio-4717, ¶ 32 (3d Dist.) (defendant's conviction for assaulting a police officer was "not against the manifest weight of the evidence simply because the trier of fact believed the testimony of the prosecution's witnesses"); *State v. Sepulveda*, 2023-Ohio-3429, ¶ 23-25 (3d Dist.) (conviction for resisting arrest was not against the manifest weight of the evidence, where officer's version of events was supported by body-camera footage and contradicted at least some of defendant's testimony). The evidence certainly does not weigh heavily against the convictions.

{¶36} Caudill's third assignment of error is overruled.

## C.     First Assignment of Error

{¶37} In the first assignment of error, Caudill argues that the trial court committed plain error by allowing allegedly improper comments during the State's opening statement and closing argument. At the very beginning of his opening statement, the prosecutor said:

> Defund the police, riots in Minneapolis, Chicago, Seattle. Massive lack of respect for school teachers and administrators across the nation. Even locally we've seen a massive uptick in people who don't show for jury duty. I think there was eight today. Unfortunately, our society is gravitating more and more towards a disrespect for authority, and that's exactly what you're gonna see in three separate incidents from the Defendant.

(Trial Tr. at 97-98). At the end of his opening statement, the prosecutor returned to the theme of disrespect for authority:

> And I'll suggest to you that [you] can use your common sense and you will see that there's – they're even trying to disrespect the authority here. They're trying to convince you that those things didn't happen when they did. And so that's something that we can't stand for as citizens of Shelby County. And at the conclusion of this case, we're gonna ask that you help deter this kind of behavior and that you find the Defendant guilty of obstructing justice, assault on a law enforcement officer, and resisting arrest. Thank you.

(*Id.* at 100-101). Finally, the prosecutor returned to the same theme at the very beginning of the State's closing argument:

> Defund the police, rioting, disrespect of teachers and school officials, cussing at law enforcement, lying to law enforcement, fighting officers and resisting arrest, throwing items at a cop are all examples of showing disrespect to authority. Over the last day and a half you've heard testimony, you've heard testimony and observed the Defendant, Jacqueline Caudill, showing a disrespect for authority.

(*Id.* at 342).

{¶38} Caudill asserts that these comments "were improper and prejudicial to Mrs. Caudill's constitutional rights, notwithstanding the lack of contemporaneous objection from her trial counsel," so her convictions must be reversed. (Appellant's Brief at 6).

### 1. Applicable Law

**{¶39}** The test regarding prosecutorial misconduct in opening statements or closing arguments is whether the conduct or remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984) (involving closing argument); *State v. Nicholson*, 2024-Ohio-604, ¶ 266, 281-282 (involving opening statement). "[I]t is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks." *Smith* at 15. "Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found [the] defendant guilty." *Id.*; *State v. Knuff*, 2024-Ohio-902, ¶ 238 (a conviction may be upheld in the face of a prosecutor's improper remarks when it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the comment).

**{¶40}** However, when there is no objection at trial to the alleged prosecutorial misconduct, we review the issue for plain error. *Nicholson* at ¶ 281 (opening statements); *State v. Ballew*, 76 Ohio St.3d 244, 254-255, 1996-Ohio-81 (1996) (closing arguments); Crim.R. 52(B). "To qualify for plain-error relief, the appellant must establish: (1) occurrence of an error, i.e., a deviation from a legal rule; (2) the error was plain, i.e., it was an obvious defect in the trial proceedings; and (3) the error affected the appellant's substantial rights, meaning the error 'must have affected the outcome of the trial.'" *State v. Cass*, 2024-Ohio-2614, ¶ 57 (3d

Dist.), quoting *State v. Morgan*, 2017-Ohio-7565, ¶ 36. Additionally, the decision to correct a plain error is discretionary and should be made with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Noling*, 2002-Ohio-7044, ¶ 62.

{¶41} "Opening statements serve to inform the jury about the nature of the case and to outline the facts that each party intends to prove." (Emphasis deleted.) *Nicholson* at ¶ 282. "And unless it appears that counsel 'deliberately attempt[ed] to influence and sway the jury by a recital of matters foreign to the case,' remarks made during opening statements cannot form the basis of a misconduct claim." *Id.*, quoting *Maggio v. Cleveland*, 151 Ohio St. 136 (1949), paragraph two of the syllabus.

{¶42} In closing arguments, "[t]he prosecution is normally entitled to a certain degree of latitude." *Smith*, 14 Ohio St.3d at 13-14 (identifying types of remarks to be avoided). A prosecutor may comment upon the evidence and suggest the conclusion to be drawn from it. *State v. Stevens*, 2016-Ohio-446, ¶ 71 (3d Dist.). However, "[a] closing argument that goes beyond the record may constitute prejudicial error," "particularly where the remarks call for the jury to convict to meet a public demand." *State v. Moritz*, 63 Ohio St.2d 150, 157 (1980). "The closing argument must, however, be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial." *Id.*

### 2.    Analysis

**{¶43}** The State's theme during its opening statement and closing argument was disrespect for authority—something that certainly related to all three offenses at issue and the nature of the case.  It is also clear that, in establishing this theme, the State referred to events unrelated to the case, such as the Defund the Police movement, rioting in other cities, and "lack of respect for school teachers and administrators across the nation."  However, the defense did not object to either the opening statement or closing argument at trial.  Therefore, we review the issue only for plain error.

**{¶44}** Caudill has not established that she qualifies for plain-error relief. This is because, even assuming the prosecutor's comments were inappropriate, Caudill has not shown a reasonable probability exists that, but for those comments, the result of the trial would have been different.  *See Stevens*, 2016-Ohio-446, at ¶ 75, 77 (3d Dist.); *Knuff*, 2024-Ohio-902, at ¶ 250 (although prosecutor's reference to a television show about a serial killer—that defendant alleged characterized him as a serial killer—was irrelevant to the case, "the state's single passing mention of that show did not deny [defendant] a fair trial and does not amount to plain error").  The body-camera footage, officers' testimony, and even some of Yelton's and Caudill's testimony provided strong evidence in support of the jury's verdicts.  Thus, even assuming there was plain error in allowing the prosecutor's comments,

we find beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found Caudill guilty. *Knuff*, 2024-Ohio-902, at ¶ 238.

**{¶45}** Caudill's third assignment of error is overruled.

## IV.   CONCLUSION

**{¶46}** For the foregoing reasons, Caudill's assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgments of the Shelby County Court of Common Pleas.

*Judgments Affirmed*

**WALDICK, P.J. and WILLAMOWSKI, J., concur.**

**/jlm**